MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 115
Docket:        Aro-13-555
Submitted
 On Briefs:    July 30, 2014
Decided:       October 21, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

SARAH CRAIG et al.

v.

KRYSTAL GAYLE CARON

SAUFLEY, C.J.

[¶1]  This appeal requires us to address the statutory definition of "stalking" for purposes of obtaining a protection from abuse order pursuant to 19-A M.R.S. § 4005(1) and 4007(1) (2013).  Krystal Gayle Caron appeals from a judgment entered in the District Court (Houlton, *O'Mara, J.*) granting Sarah Craig, individually and on behalf of her two children, an order of protection from abuse based on a finding that Caron engaged in stalking the alleged victims, and from the court's ruling on Caron's post-judgment motion for findings of fact and conclusions of law.  *See* M.R. Civ. P. 52(a).  Caron contends that the court erred in entering the judgment because Craig and her children are not "family or household members or dating partners" of Caron and the conduct found by the court does not

2

constitute stalking. 19-A M.R.S. §§ 4002(1), (3-A), (4), 4007(1) (2013); *see* 17-A M.R.S. § 210-A (2013). We agree and vacate the judgment.

## I. BACKGROUND

[¶2] Craig filed a complaint for protection from abuse on October 2, 2013, alleging that Caron, the "ex wife of [Craig's] current boyfriend," had come into her home and hit her, resulting in criminal assault charges against Caron. Caron moved to dismiss the complaint on the ground that Craig lacked standing to bring a complaint for protection from abuse against Caron. Specifically, Caron argued that Craig lacked standing because she did not allege that she and Caron were "family or household members or dating partners." 19-A M.R.S. § 4002(1), (3-A), (4).

[¶3] The court acknowledged that the matter would have been properly presented as a protection from harassment complaint. *See* 5 M.R.S. §§ 4651-4655 (2013). Nonetheless, it denied the motion to dismiss because of the possibility that Craig could demonstrate an alternative factual basis for standing to bring a protection from abuse action, that is, that Caron had stalked her. *See* 19-A M.R.S. § 4005(1); *see also* 17-A M.R.S. § 210-A (defining "stalking"). The court held an evidentiary hearing at which Craig and Caron testified.

[¶4] At the hearing, both parties testified that Caron's ex-husband, the father of two children with Caron, is in a relationship with Sarah Craig and living with her. The Carons' children are sometimes at Craig's home with their father. Craig

testified that, on September 27, 2013, Caron's children were at Craig's house and that one of them was ill. She described the genesis of the dispute as follows. After Caron's ex-husband argued with Caron over the telephone about what to do for the sick child, Craig sent Caron a text message containing "some pretty vulgar statements." Caron's ex-husband and the two children then left Craig's home to seek medical assistance for the ailing child. Shortly thereafter, Caron arrived at Craig's house. The women both testified that an altercation ensued, but they disagreed about who was the initial aggressor. Craig's three-year-old son witnessed the altercation, and he was scared. He fell down while trying to help his mother.

[¶5] After hearing the evidence, the court reached the following findings of fact based on competent evidence offered at trial. *See Preston v. Tracy*, 2008 ME 34, ¶ 10, 942 A.2d 718. Caron entered Craig's home unexpectedly without knocking or announcing herself. Craig told Caron to leave, but Caron did not leave. Caron was upset and struck Craig. Craig fell to the floor.

[¶6] Based on these findings, the court found that Caron had stalked Craig, and the court entered an order of protection from abuse. Caron moved for findings of fact and conclusions of law related to the finding of stalking, and the court entered written findings and conclusions. The court found that Caron had engaged in a "course of conduct," meaning two or more acts, of stalking by (1) entering

4

Craig's home unexpectedly without knocking and without being invited, (2) refusing to leave the home when she was asked to do so, and (3) striking Craig in the head. *See* 17-A M.R.S. § 210-A.

[¶7]  Caron timely appealed from the judgment. *See* 14 M.R.S. § 1901(1) (2013); M.R. App. P. 2(b)(3).

## II.  DISCUSSION

[¶8]  To obtain an order of protection from abuse, a plaintiff must ordinarily establish that the acts complained of occurred "between family or household members or dating partners or by a family or household member or dating partner upon a minor child of a family or household member or dating partner."  19-A M.R.S. § 4002(1); *see* 19-A M.R.S. § 4007(1).  By statute, family or household members are

> spouses or domestic partners or former spouses or former domestic partners, individuals presently or formerly living together as spouses, natural parents of the same child, adult household members related by consanguinity or affinity or minor children of a household member when the defendant is an adult household member and, for the purposes of Title 15, section 1023, subsection 4, paragraph B-1, this chapter and Title 17-A, sections 15, 207-A, 209-A, 210-B, 210-C, 211-A, 1201, 1202 and 1253 only, includes individuals presently or formerly living together and individuals who are or were sexual partners.  Holding oneself out to be a spouse is not necessary to constitute "living as spouses."  For purposes of this subsection, "domestic partners" means 2 unmarried adults who are domiciled together under long-term arrangements that evidence a commitment to remain responsible indefinitely for each other's welfare.

19-A M.R.S. § 4002(4). Dating partners are "individuals currently or formerly involved in dating each other, whether or not the individuals are or were sexual partners." *Id.* § 4002(3-A). Neither the evidence nor the court's findings would support a determination that Craig and Caron were family or household members or dating partners for purposes of the statute. Nor does Craig argue that they were.

[¶9] In certain circumstances, however, the plaintiff need not show a family, household, or dating relationship between the parties, such as when the plaintiff is "[a]n adult who has been a victim of conduct defined as stalking in Title 17-A, section 210-A." *Id.* § 4005(1). In that circumstance, the plaintiff can establish a claim "whether or not the conduct was perpetrated by a family or household member or dating partner," even if no criminal prosecution has occurred. *Id.*

[¶10] Pertinent to this case, a person engages in stalking if

[t]he actor intentionally or knowingly engages in a *course of conduct* directed at or concerning a specific person that would cause a reasonable person:

(1) To suffer serious inconvenience or emotional distress;

(2) To fear bodily injury or to fear bodily injury to a close relation;

(3) To fear death or to fear the death of a close relation;

(4) To fear damage or destruction to or tampering with property; or

6

> **(5)** To fear injury to or the death of an animal owned by or in the possession and control of that specific person.

17-A M.R.S. § 210-A(1)(A) (emphasis added). A "course of conduct" means "2 or more acts, including but not limited to acts in which the actor, by any action, method, device or means, directly or indirectly follows, monitors, tracks, observes, surveils, threatens, harasses or communicates to or about a person or interferes with a person's property." *Id.* § 210-A(2)(A). "'Course of conduct' also includes, but is not limited to, threats implied by conduct and gaining unauthorized access to personal, medical, financial or other identifying or confidential information." *Id.*

[¶11] The evidence unquestionably supports the court's finding that Caron engaged in conduct that would cause a reasonable person to suffer serious inconvenience or emotional distress or to fear bodily injury to oneself, bodily injury to a close relation, or damage or destruction to or tampering with property. *See id.* § 210-A(1)(A)(1), (2), (4). The crucial question on appeal, therefore, is whether Caron, by entering Craig's home one evening without permission, refusing to leave when asked, and assaulting Craig, all in the course of a brief period of time, engaged in "2 or more acts" of following, monitoring, tracking, observing, surveilling, threatening, harassing, communicating to or about Craig, or interfering with Craig's property. *See id.* § 210-A(2)(A).

[¶12]  In interpreting the meaning of this statute, we look first to the statute's plain language.  *See L'Heureux v. Michaud*, 2007 ME 149, ¶ 7, 938 A.2d 801.  "Only if the plain language of the statute is ambiguous do we look beyond that language to other indicia of legislative intent."  *Id.*  "Statutory language is ambiguous if it is reasonably susceptible to multiple interpretations."  *Id.*

[¶13]  There is no allegation or evidence that Caron, on two or more occasions, monitored, tracked, observed, surveiled, or communicated to or about Craig.  The question is whether, through her actions on September 27, 2013, Caron engaged in two or more acts of threatening Craig, harassing Craig, or interfering with Craig's property.  Based on the language of the statute, Caron's conduct could be viewed as either a single act or three separate acts.  *See* 17-A M.R.S. § 210-A(2)(A).  In the face of such ambiguity, we examine extrinsic information such as the legislative history of the statutes to resolve the question of statutory interpretation. *See L'Heureux*, 2007 ME 149, ¶ 7, 938 A.2d 801.

[¶14]  The current statutory language defining "course of conduct" to require "2 or more acts" originated in the Act to Amend the Laws Governing Stalking, L.D. 1873 (123d Legis. 2007).  Although the issue here is not addressed directly in any legislative materials, the following testimony presented to the Joint Standing Committee on Criminal Justice and Public Safety demonstrates that the Legislature

8

was considering circumstances in which the "2 or more acts" were distinct acts separated by time:

- Speaker of the House Glenn Cummings testified, "Two-thirds of stalkers pursue their victims at least once per week; many do so daily, using more than one method."

- Donna Strickler, Executive Director of the Sexual Assault Crisis and Support Center, testified as follows on behalf of the Maine Coalition Against Sexual Assault:

  > In Somerset County, we worked with a young woman whose landlord was letting himself into her apartment a couple of times a week and going through her things. His behavior was escalating by the time she called us. One night she was awakened from a nap on her couch to him standing over her. Another night, after working late, he was in her home waiting for her. . . .

  > In another central Maine community, we worked with a woman who was being stalked by her ex-boyfriend. By the time the woman contacted our center for support and assistance, she had moved seven or eight times, staying with friends, renting her own place even utilizing one of the safe homes of the Maine Coalition to End Domestic Violence.

- A newspaper article submitted to the Committee stated: "[T]he woman called [the police] at 1 p.m., reporting she was being followed by a man she didn't know . . . . [He] had followed her on more than three occasions in

Rumford over the past month and a half." Terry Karkos, *Cops File Stalking Charge*, Sun Journal, May 9, 2007.

- Jen LaChance Sibley, Outreach Coordinator for Family Crisis Services, testified as follows on behalf of the Maine Coalition to End Domestic Violence:

> Seeking contact may seem innocent to you all sitting here today. However, what I hear is 47 phone messages left on a woman's voicemail in a morning. Her ex-partner wants to know where she had spent the night before because he didn't see her car parked at her apartment. I hear a victim who has walked into her work and seen a flyer that her ex-partner left that defamed her character; after work, the same posters plastered on telephone poles and local businesses in the Old Port confront her. I hear a victim who has relocated to a new home, bought a new car and changed job locations because her stalker found her at the last place she moved to. Her stalker frequented her place of employment and stood in her line at the register to purchase items even though he lived 60 miles away. I hear victims whose stalkers follow them to work everyday and sit in the parking lot to make sure they are really going to work and to monitor their movements. . . .
>
> . . . . What I see and hear . . . are victims who have to change their daily routine and their work schedule, carry pepper spray, and make phone calls to their family members notifying them that they got to work okay that day without an incident.

[¶15] None of the examples depicted in any of the legislative history describes as stalking a single event of a person arriving uninvited at a home and assaulting another person. The Legislature, in adding "stalking" to the protection from abuse statute, intended to address the types of repeated acts that create fear

and apprehension, and that may signal a potential escalation toward lethality. *See* P.L. 2007, ch. 685, § 3 ("The Legislature finds stalking can lead to death, sexual assault, physical assault and property damage.").

[¶16] Stalking, as described in the statute and by those who supported the statutory amendment, involves repeated behavior that must be taken seriously by law enforcement, prosecutors, and the courts. To employ "stalking" as a catch-all phrase that incorporates any bad behavior that, although occurring in a single incident, can be described as multiple actions, would undermine the Legislature's intent in specifically defining the crime of stalking. We cannot conclude that the Legislature intended the definition of stalking to be so diluted, especially when an alternative process initiated by a protection from harassment complaint can address single incidents of assault or other violent crimes. *See* 5 M.R.S. § 4651(2)(C) (defining harassment to include a "single act or course of conduct constituting a violation of . . . Title 17-A, section[] . . . 207," the assault statute).

[¶17] It is understandable that the trial court would endeavor to afford protection to a person who experienced violence in her home given the pernicious nature of domestic violence and its responsibility for forty-six percent of Maine's total homicides during 2012 and 2013. *See* Maine Domestic Abuse Homicide Review Panel, 10th Report: Building Bridges Towards Safety and Accountability

to End Domestic Violence Homicide 10 (Apr. 2014).[1] If a protection order is required, however, Craig may seek relief by filing a protection from harassment complaint pursuant to 5 M.R.S. § 4652.

[¶18] Although Caron's conduct may have been criminal,[2] *see* 17-A M.R.S. § 207 (2013) (assault), it does not fall within the definition of *stalking*, and the court erred in concluding that it was. To interpret the statute broadly enough to encompass the conduct at issue here would dishonor the legislative intent to protect victims of the serious crime of stalking who have suffered from other individuals' recurrent interference with their daily lives through the means that the Legislature described. *See id.* § 210-A(2)(A).

## III. CONCLUSION

[¶19] Because the parties are not family or household members or dating partners, and because the facts do not establish that Caron violated the stalking

---

[1] Children who observe interpersonal violence may be injured by that exposure even when they are not, themselves, the target of, or physically injured by, that violence. The co-chairs of the United States Attorney General's National Task Force on Children Exposed to Violence noted, "Advances in neuroscience and child development have taught us that the trauma children experience when they are exposed to physical, sexual, and emotional violence harms their ability to mature cognitively and emotionally, and it scars them physically and emotionally well into their adult lives." U.S. Department of Justice, *Report of the Attorney General's National Task Force on Children Exposed to Violence*, Introduction From the Task Force Co-Chairs (Dec. 12, 2012); *see also* Child Welfare Information Gateway, *Child Witnesses to Domestic Violence* 1-2 (current through Nov. 2012) ("Children who witness domestic violence can suffer severe emotional and developmental difficulties that are similar to those of children who are direct victims of abuse."). Craig's three-year-old son witnessed the violence in this case and began crying and trying to help his mother. We urge the parties to focus their attention on avoiding further harm to their children through exposure to adult violence.

[2] Craig did testify that she called the police after Caron left her home.

provisions of the protection from abuse statute, the statute did not authorize the entry of a protection from abuse judgment for Craig and her children. *See* 19-A M.R.S. §§ 4002(1), (3-A), (4), 4007(1); *see also* 17-A M.R.S. § 210-A. Accordingly, we vacate the judgment.

The entry is:

> Judgment vacated and remanded for the entry of a denial of an order for protection from abuse.

---

**On the briefs:**

Stephen D. Nelson, Esq., Severson, Hand, & Nelson, P.A., Houlton, for appellant Krystal Gayle Caron

Sarah Craig did not file a brief

Houlton District Court docket number PA-2013-78
FOR CLERK REFERENCE ONLY