MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:    2018 ME 97
Docket:      Ken-17-326
Argued:      March 7, 2018
Decided:     July 12, 2018
Revised:     July 24, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:    SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JJ.
Dissent:     HJELM, JABAR, and HUMPHREY, JJ.

STATE OF MAINE

v.

KASHAWN MCLAUGHLIN

GORMAN, J.

[¶1]  Kashawn McLaughlin appeals from a judgment of conviction of aggravated trafficking in schedule W drugs (Class A), 17-A M.R.S. § 1105-A(1)(D) (2017), entered by the trial court (Kennebec County, *Murphy, J.*) after a jury trial.[1]  McLaughlin argues that pursuant to section 1105-A(1)(D) the State must prove the weight of pure cocaine base in isolation and that the court erred by failing to include that requirement in its instructions

---

[1]  After the jury trial, the court also entered a judgment of conviction for unlawful trafficking in schedule W drugs (Class B), 17-A M.R.S. § 1103(1-A)(A) (2017), and made two findings regarding criminal forfeiture of property, 15 M.R.S. § 5826 (2017).  Because McLaughlin does not assign error to these judgments, we do not address them further.

to the jury.  Because we conclude that section 1105-A(1)(D) does not require the State to prove the weight of "pure" cocaine base, we affirm the judgment.[2]

## I.  BACKGROUND

[¶2]  Viewed in the light most favorable to the jury's verdict, the record supports the following facts.  *State v. Adams*, 2015 ME 30, ¶ 2, 113 A.3d 583.  On November 2, 2015, agents from the Maine Drug Enforcement Agency (MDEA) received information from a confidential informant indicating that McLaughlin was staying in and selling drugs out of room 175 at the Senator Inn in Augusta.  Based on this information and their observation of individuals coming and going from room 175, MDEA agents sought and obtained a search warrant for the room.  The search warrant referred to McLaughlin by name.

[¶3]  At around 6:30 p.m. that evening, with the help of the Augusta Police Department, MDEA agents executed the search warrant for room 175.  Upon executing the warrant, the officers and agents secured and identified six individuals in the room, including McLaughlin.  In the room, agents observed and seized, among other items, over $10,000 in cash; two firearms and ammunition; a dish in the microwave with white and yellow residue; three digital scales; a plastic bag containing a hard, light-brown material; fourteen

---

[2]  McLaughlin's other arguments on appeal are unpersuasive, and we do not address them further.

3

individually sealed bags with a hard, off-white material; and an individual bag containing a large "ball" of hard, off-white material. All six individuals in room 175 were arrested.

[¶4] The State conducted a controlled substance analysis on several of the items seized from room 175. The analysis confirmed that the residue on the dish contained cocaine base; all three digital scales had residue containing cocaine and heroin; the light-brown material weighed sixty-five grams and contained heroin; the total weight of the hard, off-white material in the fourteen bags was 3.4 grams and at least one of the bags contained cocaine base; and the large "ball" of hard, off-white material weighed 100.6 grams and contained cocaine base. The controlled substance analysis identified the presence of heroin and cocaine base but did not determine the precise weight of each drug in isolation.

[¶5] On January 21, 2016, a grand jury indicted McLaughlin on five charges stemming from his November 2, 2015, arrest. Among the charges were Count 1, aggravated trafficking in schedule W drugs (Class A), namely cocaine in the form of cocaine base, 17-A M.R.S. § 1105-A(1)(D), and Count 2, aggravated trafficking in schedule W drugs (Class A), namely heroin, 17-A

M.R.S. § 1105-A(1)(H) (2017).[3] A jury trial on the charges took place over three days from November 1 to November 3, 2016. On the first day of the trial, the State orally moved to amend Count 2 to a charge of unlawful trafficking in heroin (Class B), 17-A M.R.S. § 1103(1-A)(A) (2017), which the court granted without objection by the defendant. At trial, two of the individuals arrested with McLaughlin testified that McLaughlin knowingly trafficked in what he knew to be illegal drugs on November 2, 2015.

[¶6] At the close of trial, the court provided several instructions to the jury, including the following instruction related to Count 1: "Cocaine base includes any mixture or preparation that contains any quantity of cocaine base, which is the alkaloid base of cocaine." McLaughlin did not object to this instruction. The jury found McLaughlin guilty of Count 1, aggravated trafficking in cocaine in the form of cocaine base and Count 2, unlawful trafficking in heroin, on November 3, 2016. On July 11, 2017, the court sentenced McLaughlin to twenty years in prison with all but twelve years suspended and four years of probation on Count 1, and a concurrent six-year prison sentence

---

[3] The indictment also charged McLaughlin with Count 3, possession of a firearm by a prohibited person (Class C), 15 M.R.S. § 393(1)(A-1)(3) (2017); Count 4, criminal forfeiture of money, 15 M.R.S. § 5826 (2017); and Count 5, criminal forfeiture of firearms, 15 M.R.S. § 5826. The State eventually dismissed Count 3. After the sentencing hearing, the court made specific findings regarding Counts 4 and 5 and ordered the forfeiture of the money and firearms at issue. *See* 15 M.R.S. § 5826.

on Count 2. McLaughlin appeals only the judgment of conviction for aggravated trafficking in cocaine in the form of cocaine base. *See* 15 M.R.S. § 2115 (2017); M.R. App. P 2(b)(2)(A) (Tower 2016); *see also* M.R. App. P. 2B(b)(1).[4]

## II. DISCUSSION

[¶7] McLaughlin argues that the court erred by instructing the jury that "[c]ocaine base includes any mixture or preparation that contains any quantity of cocaine base." He contends that 17-A M.R.S. §§ 1102(1)(F), 1105-A(1)(D) (2017) require the State to prove the weight of pure cocaine base in isolation— not the overall weight of the mixture or preparation that contains some quantity of cocaine base.

A. Standard of Review

[¶8] Because McLaughlin did not object to the jury instructions at trial, we review the court's jury instruction regarding cocaine base for obvious error. *See State v. Daluz*, 2016 ME 102, ¶ 51, 143 A.3d 800. "When we review for obvious error, we review for (1) an error, (2) that is plain, and (3) that affects substantial rights." *Id.* (quotation marks omitted). If we conclude that these three conditions are met, "we will exercise our discretion to notice an

---

[4] The Maine Rules of Appellate Procedure were restyled and are applicable to appeals commenced on or after September 1, 2017. *See* M.R. App. P. 1 (restyled Rules). Because McLaughlin filed this appeal before September 1, 2017, the restyled Maine Rules of Appellate Procedure do not apply.

unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or reputation of judicial proceedings." *Id.* (quotation marks omitted).

[¶9] To determine whether the court erred by instructing the jury on cocaine base, we must interpret—for the first time—the definition of "cocaine" provided in 17-A M.R.S. § 1102(1)(F), in conjunction with the phrase "cocaine in the form of cocaine base" as used in the aggravated trafficking statute, 17-A M.R.S. § 1105-A(1)(D). *See State v. Pinkham*, 2016 ME 59, ¶ 19, 137 A.3d 203. "We review questions of statutory interpretation de novo," *State v. Christen*, 2009 ME 78, ¶ 12, 976 A.2d 980, and our standard for interpreting statutes is well established:

> In interpreting these provisions, we first look to the plain language of the provisions to determine their meaning. If the language is unambiguous, we interpret the provisions according to their unambiguous meaning unless the result is illogical or absurd. If the plain language of a statute is ambiguous—that is, susceptible of different meanings—we will then go on to consider the statute's meaning in light of its legislative history and other indicia of legislative intent. In applying these principles, we examine the entirety of the statute, giving due weight to design, structure, and purpose as well as to aggregate language. We reject interpretations that render some language mere surplusage.

*State v. Dubois Livestock, Inc.*, 2017 ME 223, ¶ 6, 174 A.3d 308 (citations omitted) (quotation marks omitted). When, as here, we are "interpreting a

criminal statute, we are guided by two interrelated rules of statutory construction: the rule of lenity, and the rule of strict construction." *Pinkham*, 2016 ME 59, ¶ 14, 137 A.3d 203 (quotation marks omitted). If the Legislature's intent remained indecipherable after using the tools of construction available to us, the rule of lenity would require us to resolve any ambiguities in McLaughlin's favor. *See State v. Stevens*, 2007 ME 5, ¶ 16, 912 A.2d 1229; *United States v. Wells*, 519 U.S. 482, 499 (1997) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, . . . we can make no more than a guess as to what Congress intended." (quotation marks omitted)).

B.      The Statutes and Their Interpretation

        1.      Plain Language

[¶10]   As with all statutory interpretation, we begin with the statutory language while "giving due weight to design, structure, and purpose." *Dubois Livestock, Inc.*, 2017 ME 223, ¶ 6, 174 A.3d 308 (quotation marks omitted). The Maine Criminal Code, title 17-A, comprises five parts. The statutes establishing drug-related crimes are found in part 2, chapter 45, entitled simply "Drugs." The chapter opens with two statutes containing definitions and schedules of drugs that apply to the entire chapter. *See* 17-A M.R.S. §§ 1101-1102 (2017).

The Legislature defined "cocaine" in the second of those statutes, section 1102(1)(F):

> **F.** Cocaine means:
>
> > **(1)** Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine and derivatives of ecgonine and their salts have been removed; and
> >
> > **(2)** A mixture or preparation that contains any quantity of any of the following substances:
> >
> > > **(a)** Cocaine, its salts, optical and geometric isomers and salts of isomers;
> > >
> > > **(b)** Ecgonine, its derivatives, their salts, isomers and salts of isomers; or
> > >
> > > **(c)** Cocaine base, which is the alkaloid form of cocaine.

[¶11]  In the sections following section 1102, the Legislature set out various types of drug crimes—possession, trafficking, furnishing, and aggravated forms of trafficking and furnishing. *See* 17-A M.R.S. §§ 1103, 1105-A, 1105-C, 1106, 1107-A (2017).  Intentional or knowing possession of any amount of cocaine is a crime, although the amount possessed, the existence or lack of any prior convictions for possession, and whether the cocaine is in the form of cocaine base will determine whether the crime is a Class D, C, or B offense.  *See* 17-A M.R.S. § 1107-A.  In addition, intentionally or knowingly trafficking in any amount of cocaine is a Class B crime, 17-A M.R.S.

9

§ 1103(1-A)(A), and possession of fourteen grams or more of cocaine or four grams or more of cocaine in the form of cocaine base "gives rise to a permissible inference under the Maine Rules of Evidence, Rule 303, that the person is unlawfully trafficking in scheduled drugs." 17-A M.R.S. § 1103(3)(B). Trafficking in cocaine, Class B, is elevated to aggravated trafficking, Class A,[5] if the individual traffics in cocaine

- to a child as a customer;
- with a child as an assistant;
- while having one or more convictions for "engaging in substantially similar conduct";
- while in possession of a firearm;
- on a school bus or near a school or safe zone; or
- when "[d]eath is in fact caused by the use of that [cocaine]."

*See* 17-A M.R.S. § 1105-A(1).

[¶12] Furthermore, a cocaine trafficking charge can be elevated to an aggravated trafficking charge when the person charged with trafficking has in his or her possession an amount of cocaine that exceeds a specified amount determined by the Legislature. *See* 17-A M.R.S. § 1105-A(1)(D). At trial, the State presented evidence that, at the time of his arrest for trafficking, McLaughlin was in possession of a hard, off-white material that cumulatively

---

[5] If a person traffics in cocaine and "[s]erious bodily injury is in fact caused by the use of that [cocaine]," the crime is Class B aggravated trafficking. 17-A M.R.S. § 1105-A(1)(L) (2017).

weighed over one-hundred grams and contained some undetermined amount of cocaine base. Based on the weight of this material, McLaughlin was charged with and convicted of aggravated trafficking in cocaine as defined by subsection (1)(D) of section 1105-A, which states:

> **D.** At the time of the offense, the person traffics in cocaine in a quantity of 112 grams or more *or cocaine in the form of cocaine base in a quantity of 32 grams or more*. Violation of this paragraph is a Class A crime.

(Emphasis added.) As the language makes clear, a person may be found guilty of aggravated trafficking in cocaine due to the weight of the drug if the State proves that the person was trafficking in (1) "cocaine in a quantity of 112 grams or more" or (2) "*cocaine in the form of cocaine base* in a quantity of 32 grams or more." 17-A M.R.S. § 1105-A(1)(D) (emphasis added).

[¶13] McLaughlin contends that although "cocaine in a quantity of 112 grams or more" refers to 112 grams or more of "[a] mixture or preparation that contains any quantity of" cocaine,[6] "cocaine in the form of cocaine base in a quantity of 32 grams or more" must be "pure" cocaine base in isolation. *See* 17-A M.R.S. §§ 1102(1)(F), 1105-A(1)(D). He asserts that, because the State

---

[6] We agree with this contention made by McLaughlin. In *State v. Johnson*, 2005 ME 46, 870 A.2d 561, we considered certain trafficking offenses alongside the definition of cocaine as provided by 17-A M.R.S. § 1102(1)(F) (2017) and held that "[a] defendant is guilty of trafficking in cocaine if he traffics in *cocaine in whatever form*." *Johnson*, 2005 ME 46, ¶ 12, 870 A.2d 561 (emphasis added).

11

failed to present evidence that at least thirty-two grams of the material he possessed containing cocaine base was pure cocaine base, the State failed to meet its burden of proof. We disagree.

[¶14] In our recent decision in *State v. Pinkham*, we concluded that 17-A M.R.S. §§ 1101(17)(E), 1102(1)(I), 1103(1-A)(A) (2015) required the State to prove the actual amount of pure heroin in isolation as an element of the trafficking offense because "heroin" was no longer specifically defined as any mixture or "compound *containing* heroin."[7]  *Pinkham*, 2016 ME 59, ¶¶ 15-18, 137 A.3d 203. We also explained in *Pinkham* that the definition of "cocaine" found in section 1102(1)(F) is an example of how, "when the Legislature uses the name of a drug and intends for the term to include mixtures containing that drug, it knows how to accomplish that result." 2016 ME 59, ¶ 21, 137 A.3d 203.

[¶15] In dividing various drugs into schedules, and then setting out its definitions of the drugs, including cocaine, within those schedules, the Legislature explained that the definitions were to be used "[f]or the purposes of defining crimes under this chapter and of determining the penalties

---

[7] The Legislature has since changed the definition of schedule W drugs to include "any compound, mixture or preparation containing narcotic drugs *in any quantity*, including but not limited to . . . heroin."  17-A M.R.S. § 1102(1)(I) (2017) (emphasis added); *see* P.L. 2017, ch. 274, § 2 (adding the phrase "in any quantity"); L.D. 1546, Summary (128th Legis. 2017) (explaining that the "bill clarifies that any compound, mixture or preparation containing narcotic drugs in any quantity is a schedule W drug").

therefor." 17-A M.R.S. § 1102. Section 1102(1)(F)(2) states that "[c]ocaine means . . . [a] mixture or preparation that contains any quantity of any of the following substances"; among "the following substances" is "[c]ocaine base, which is the alkaloid form of cocaine." 17-A M.R.S. § 1102(1)(F). "When a statute specifically defines a term, we cannot redefine it." *Rockland Plaza Realty Corp. v. City of Rockland*, 2001 ME 81, ¶ 10, 772 A.2d 256. Because "cocaine" as defined by the Legislature specifically includes mixtures containing any amount of cocaine, "cocaine" throughout title 17-A, chapter 45 means "[a] mixture or preparation" containing cocaine. 17-A M.R.S. § 1102(1)(F). Contrary to McLaughlin's argument, the words "in the form of" in the phrase "cocaine *in the form of* cocaine base" do not change the definition of "cocaine" in that same phrase. 17-A M.R.S. § 1105-A(1)(D) (emphasis added). Cocaine, as defined by the Legislature and as used in that phrase, includes "mixture[s] or preparation[s]" that contain any amount of cocaine. 17-A M.R.S. § 1102(1)(F).

[¶16] Thus, when examined "in the context of the entire statutory scheme," *State v. Kendall*, 2016 ME 147, ¶ 14, 148 A.3d 1230, the thirty-two gram weight threshold in section 1105-A(1)(D) applies to a specific form of "cocaine": a mixture or preparation that contains cocaine base. *See* 17-A M.R.S. §§ 1102(1)(F), 1105-A(1)(D). Had the Legislature intended to apply the lower

weight threshold to pure cocaine base in isolation, it would not have attached that weight to the phrase "*cocaine* in the form of cocaine base"—which includes a word explicitly defined as "[a] mixture or preparation." 17-A M.R.S. §§ 1102(1)(F), 1105-A(1)(D) (emphasis added); *see Pinkham*, 2016 ME 59, ¶ 18, 137 A.3d 203. To read section 1105-A(1)(D) as McLaughlin urges would render the words "cocaine in the form of" mere surplusage. "[B]ecause no language is to be treated as surplusage if it can be reasonably construed, we must give meaning to this language." *Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 20, 896 A.2d 271. We therefore conclude that a plain reading of sections 1102(1)(F) and 1105-A(1)(D) indicates a legislative intent that the thirty-two gram weight threshold applies to the overall weight of any mixture or preparation that contains any quantity of cocaine base.

2.    Ambiguity and Legislative History

[¶17]  Although the plain language review discussed above leaves little room for a claim of ambiguity, to the extent that sections 1102(1)(F) and 1105-A(1)(D) could be deemed ambiguous, the applicable legislative history and other indicia of legislative intent support our interpretation. *See Dubois Livestock, Inc.*, 2017 ME 223, ¶ 6, 174 A.3d 308. The language establishing the current definition of cocaine in section 1102(1)(F) and the language setting the

weight thresholds for aggravated trafficking in section 1105-A(1)(D) became effective in 1996. *See* P.L. 1995, ch. 635, §§ 1, 4.[8]  Before 1996, the Legislature had not included the term "cocaine base" in the definition of "cocaine" in section 1102(1)(F).[9]  Congress, on the other hand, has included the term "cocaine base" in its criminal offenses regarding cocaine since the 1980s. *DePierre v. United States*, 564 U.S. 70, 74-75 (2011).[10]

---

[8] Title 17-A M.R.S.A. § 1105 (Supp. 2000) was repealed and replaced by the Legislature with 17-A M.R.S. 1105-A (2017) in 2001.  *See* P.L. 2001, ch. 383, §§ 119, 156 (effective Jan. 31, 2003).  The language in the current version of 17-A M.R.S. § 1105-A(1)(D) stating "cocaine in the form of cocaine base in a quantity of 32 grams or more" is the same language added by P.L. 1995, ch. 635, § 4.

[9] Before this change, the Maine Revised Statutes Annotated contained the following definition of cocaine:

> Coca leaves except coca leaves and extracts of coca leaves from which cocaine, ecgonine and derivatives of ecgonine or their salts have been removed; cocaine, its salts, optical and geometric isomers and salts of isomers; ecgonine, its derivatives, their salts, isomers and salts of isomers; or *any compound, mixture or preparation of which contains any quantity of any of the substances referred to in this paragraph*.

17-A M.R.S.A. § 1102(1)(F) (Supp. 1995) (emphasis added); *see* P.L. 1989, ch. 334, § 1.

[10] The United States Supreme Court's decision in *DePierre v. United States*, 564 U.S. 70 (2011) discusses the different forms of cocaine.  The Court in *DePierre* had to "decide whether the term 'cocaine base' as used in [21 U.S.C.S. § 841(b)(1)(B) (LEXIS through Pub. L. No. 115-193] refers generally to cocaine in its chemically basic form or exclusively to what is colloquially known as 'crack cocaine.'" *DePierre*, 564 U.S. at 72.  The Court explained that when the leaves from a coca plant are processed, a paste-like substance known as coca paste is formed, and coca paste contains "cocaine in its base form," which has the molecular formula $C_{17}H_{21}NO_4$. *Id.* at 73.  "Dissolving coca paste in water and hydrochloric acid produces (after several intermediate steps) cocaine hydrochloride, which is a salt with the molecular formula $C_{17}H_{22}NO_4+Cl\text{-}$." *Id.*  Cocaine hydrochloride—referred to as "powder cocaine"—is chemically distinct from cocaine base and is usually ingested by snorting to obtain a high. *Id.*

Cocaine hydrochloride can be converted into "crack cocaine" by combining it with water and a base, such as sodium bicarbonate (baking soda), and applying heat. *Id*.  Crack cocaine contains cocaine in its alkaloid form, i.e., cocaine as a base.  *Id.*  at 73-74.  Cocaine hydrochloride can also, however, be converted into "freebase" cocaine which also contains cocaine in its basic or alkaloid

[¶18]  The Legislature was deeply concerned with the spread of cocaine base, generally known as "crack," when it enacted P.L. 1995, ch. 635.  Not only was the pertinent bill titled "An Act to Discourage the Spread of 'Crack' Cocaine," L.D. 1457 (117th Legis. 1995), but the Statement of Fact for the bill explained that it was responding "to the recent appearance in the State of cocaine base, commonly referred to as crack cocaine, and seeks to discourage the spread of cocaine base."  L.D. 1457, Statement of Fact (117th Legis. 1995).

[¶19]  The bill's Statement of Fact referred to the different forms of cocaine, and how they are used:

> Cocaine hydrochloride, the powder form of cocaine, is usually ingested by snorting, whereas cocaine base can be smoked by heating it and inhaling the hot vapors.  Smoking cocaine base delivers the drug to the brain more rapidly than snorting cocaine hydrochloride.  The resulting high is quicker and far more intense, so typically the user is addicted more quickly and develops an exponentially increasing demand for additional cocaine base.

---

form.  *Id*. at 74.  Coca paste, crack cocaine, and freebase cocaine, therefore, are all forms of cocaine base, and all three forms are *smoked* to obtain a high.  *Id.* at 72-74.

The decision in *DePierre* also sheds some light on why Congress and the Maine Legislature sought to treat cocaine in the form of cocaine base differently from other forms of cocaine.  As the Court noted in *DePierre*, "[n]umerous witnesses at the [Congressional] hearings testified that the primary reason crack cocaine was so dangerous was because—contrary to cocaine powder—cocaine in its base form is smoked, which was understood to produce a faster, more intense, and more addictive high than powder cocaine."  *Id.* at 84.  The Court ultimately concluded that the term "cocaine base" encompassed more than just "crack cocaine."  *Id.* at 89.

L.D. 1457, Statement of Fact (117th Legis. 1995). Tellingly, the bill elaborated that "[t]he disparity between the sentences imposed under this bill for cocaine base and for cocaine hydrochloride *is justified by the addictive nature of cocaine base and the level of violence associated with its use and distribution*." L.D. 1457, Statement of Fact (117th Legis. 1995) (emphasis added). The Legislature, therefore, intended to establish harsher punishments for those individuals who possessed cocaine in the form of cocaine base because it saw this form—the alkaloid or basic form of cocaine that is smoked—as more dangerous.[11] *See* L.D. 1457, Statement of Fact (117th Legis. 1995). To realize its intent, the Legislature promulgated statutes that make the possession of smaller amounts of cocaine in the form of cocaine base trigger a presumption of trafficking, 17-A M.R.S. § 1103(3)(B), and elevate trafficking to aggravated trafficking, 17-A M.R.S. § 1105-A(1)(D).

[¶20] In addition, the Committee Amendment inserting the phrase "cocaine in the form of cocaine base" throughout title 17-A, chapter 45, clarifies that the Legislature was focused on the "usage units" when setting the lower

---

[11] It makes sense that the Legislature established the weight differential based on perceived harm rather than the relative purity of the drugs or the weight of the drugs in isolation, because cocaine in the form of cocaine base (crack cocaine) is not necessarily purer than cocaine hydrochloride (powdered cocaine). *See United States v. Nelson*, 6 F.3d 1049, 1052 (4th Cir. 1993) (explaining that the crack cocaine seized was eighty-seven to ninety-one percent pure cocaine base while the powdered cocaine seized was ninety-six percent pure cocaine hydrochloride).

weight threshold—not the weight of pure cocaine base in isolation.[12]  Comm.

Amend. A to L.D. 1457, No. H-696 (117th Legis. 1996).  The Amendment

explained that the weight associated with the permissible inferences for

trafficking in cocaine in the form of cocaine base "is based upon a finding that

the present *single usage unit of cocaine base* in Maine has an average weight of

less than .10 grams."  Comm. Amend. A to L.D. 1457, No. H-696 (117th Legis.

1996) (emphasis added).  This reference to usage units demonstrates that the

Legislature understood that cocaine in the form of cocaine base—including

crack cocaine—*is* a mixture or preparation that contains some quantity of

cocaine base.  *See DePierre*, 564 U.S. at 79, n.9 ("[C]rack cocaine *is itself a*

*'substance'* involved in drug offenses; it is the end product that is bought, sold,

and consumed." (emphasis added)); *United States v. Tucker*, 20 F.3d 242, 244

(7th Cir. 1994) ("Users of cocaine base need not wait until the water evaporates

before using the drug; nor, for that matter, must users separate the cocaine

from the baking soda.  All three ingredients are part of a whole, blended

---

[12] Indeed, every time the Legislature has associated cocaine base with a weight threshold it used the phrase "cocaine in the form of" rather than just using the words "cocaine base." *See* 17-A M.R.S. §§ 1103(3)(B), 1105-A(1)(D), 1105-C(1)(D), 1106(3)(B), 1107 A(1)(A)(2), (B)(3), 1118-A(1)(C) (2017); P.L. 1995, ch. 635, §§ 2, 4-6.  This includes section 1103(3)(B), which provides a permissible inference of unlawful trafficking in scheduled drugs if the State provides proof "that the person intentionally or knowingly possesses . . . 4 grams or more of *cocaine in the form of* cocaine base." (Emphasis added.)

together, and therefore comport with the common understanding of 'mixture' . . . .").

[¶21]   The Amendment also explained the reasons for distinguishing between 112 grams of "cocaine" and thirty-two grams of "cocaine in the form of cocaine base."  Comm. Amend. A to L.D. 1457, No. H-696 (117th Legis. 1996).  The lower threshold for cocaine in the form of cocaine base stemmed from "evidence that individuals in possession of 32 grams or more of cocaine base have significant direct links to major sources of supply and present an extraordinary threat and risk to the health and safety of the citizens of the State."  Comm. Amend. A to L.D. 1457, No. H-696 (117th Legis. 1996).  The Legislature based its thirty-two gram weight threshold in section 1105-A(1)(D) on a "comparison with 21 U.S.C. § 841(b)(1)(B)(iii)"—which specifies weights based on a "mixture or substance" that "contains cocaine base."  Comm. Amend. A to L.D. 157, No. H-696 (117th Legis. 1996); 21 U.S.C.S. § 841(b)(1)(B)(iii) (LEXIS through Pub. L. No. 115-193).  Contrary to McLaughlin's contentions, there is nothing in the legislative history to suggest that the Legislature set a lower weight threshold for crimes involving cocaine in the form of cocaine base because it wanted to require the State to prove the weight of pure cocaine base in isolation.

[¶22]  As a whole, the legislative history supports our conclusion that the Legislature intended to impose harsher punishment on individuals in possession of smaller amounts of cocaine in the form of cocaine base because it saw the usable units of that drug as more harmful in smaller quantities than powdered cocaine.  We therefore reject McLaughlin's arguments regarding the interpretation of sections 1102(1)(F) and 1105-A(1)(D), and because the applicable legislative history resolves any potential ambiguities, the rule of lenity does not apply.  *See Stevens*, 2007 ME 5, ¶ 16, 912 A.2d 1229; *Wells*, 519 U.S. at 499.

## III.  CONCLUSION

[¶23]  We conclude that section 1105-A(1)(D) does not require the State to prove the weight of "pure" cocaine base because the definition of cocaine in the form of cocaine base is "[a] mixture or preparation that contains any quantity of" cocaine base.  17-A M.R.S. § 1102(1)(F).  In this case, the court committed no error, let alone obvious error, when it instructed the jury that "[c]ocaine base includes any mixture or preparation that contains any quantity of cocaine base, which is the alkaloid base of cocaine."

The entry is:

Judgment affirmed.

---

HJELM, J., with whom JABAR and HUMPHREY, JJ., join, dissenting.

[¶24] As it applies to cocaine, the quantitative threshold necessary to commit the Class A crime of aggravated trafficking of scheduled drugs is 112 grams of "cocaine" or 32 grams of "cocaine in the form of cocaine base." *See* 17-A M.R.S. § 1105-A(1)(D) (2017).[13] In my view, when a prosecution is for aggravated trafficking of "cocaine in the form of cocaine base," the plain language of this statute requires the State to prove the weight of that cocaine base in isolation and without regard to the weight of any other accompanying material. Further, even if there is a need to resort to consideration of the legislative history of the relevant statutes, the result is the same. Consequently, the court's instructions to the jury in this case contained obvious error because the instructions misstated a central element of the charge and thereby relieved the State of its burden to prove the quantity of cocaine base required by the

---

[13] This stands in contrast to 17-A M.R.S. § 1103(1-A)(A) (2017), which creates the lesser, nonaggravated Class B crime of trafficking in cocaine. A prosecution for a violation of that statute does not require the State to prove any particular quantity of the drug, although a person's possession of at least 4 grams of "cocaine in the form of cocaine base" supports a permissible inference that the person is trafficking in the drug. 17-A M.R.S. § 1103(3)(B) (2017). Therefore, the interpretation of the language central to this case will bear on the identical language found in that statute.

statute.  More importantly, the State presented *no* evidence whatsoever of the amount of actual cocaine base that Kashawn McLaughlin was charged with trafficking.  As a matter of law, the evidence was therefore insufficient to support a conviction for aggravated trafficking in cocaine base.  For these reasons, I respectfully dissent from the Court's conclusion affirming the conviction for that charge.

[¶25]  The issue presented here is entirely one of statutory construction, which the Court must determine de novo.  *See State v. Stevens*, 2007 ME 5, ¶ 5, 912 A.2d 1229.  I will consider in turn the plain language of section 1105-A(1)(D) and then that statutory language as seen through the lens of its legislative history.

A.     Plain Language

[¶26]  When presented with an issue of statutory construction, the Court must "first examine the plain meaning of the statutory language" to determine legislative intent and the legislation's purpose.  *State v. Solomon*, 2015 ME 96, ¶ 9, 120 A3d 661 (quotation marks omitted).  In doing so, the Court will seek to "avoid[] results that are absurd, inconsistent, unreasonable, or illogical."  *Id*. (quotation marks omitted).  Further, the Court "examine[s] the entirety of the statute, giving due weight to design, structure, and purpose as well as to

aggregate language." *State v. Dubois Livestock, Inc.*, 2017 ME 223, ¶ 6, 174 A.3d 308 (quotation marks omitted).

[¶27]  The Legislature has defined "cocaine" in the following way:

**F.**  Cocaine means:

> **(1)** Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine and derivatives of ecgonine and their salts have been removed; and
>
> **(2)** A mixture or preparation that contains any quantity of any of the following substances:
>
>> **(a)** Cocaine, its salts, optical and geometric isomers and salts of isomers;
>>
>> **(b)** Ecgonine, its derivatives, their salts, isomers and salts of isomers; or
>>
>> **(c)** Cocaine base, which is the alkaloid form of cocaine.

17-A M.R.S. § 1102(1)(F) (2017).  "Cocaine" is therefore an umbrella term that comprises four different categories, the last of which is the one relevant to this appeal.

[¶28]  Pursuant to section 1102(1)(F)(2)(c), "cocaine" includes "any mixture or preparation that contains any quantity of . . . [c]ocaine base."  This means that any mixture or preparation containing any amount of cocaine base is "cocaine," whereas "cocaine base" is but one specific form of cocaine, namely, "the alkaloid form of cocaine."  *But see State v. Johnson*, 2005 ME 46, ¶ 10,

870 A.2d 561 (stating, notwithstanding the definition of "cocaine base" contained in section 1102(1)(F)(2)(c), that the term "'cocaine base' is not defined"). In other words, "cocaine base" is a subset of "cocaine." Therefore, if a person is charged with possession of or trafficking in cocaine generally, it is sufficient for the State to prove that the substance involved was an amalgam that contained one of three forms of cocaine, which includes cocaine base.

[¶29] Here, however, McLaughlin was prosecuted for aggravated trafficking in scheduled drugs, which, based on the statutory formulation of the charge, required the State to prove specifically that he trafficked in "cocaine *in the form of cocaine base* in a quantity of 32 grams or more."[14] *See* 17-A M.R.S. § 1105-A(1)(D) (emphasis added). That phrase—"in *the* form of cocaine base"—is plainly a restrictive modifier because it explicitly requires the substance to be cocaine in the specific form of cocaine base.

[¶30] The Court reaches the contrary conclusion—that "cocaine in the form of cocaine base" can be any mixture or preparation containing any amount of cocaine base. *See supra* ¶ 16. This reading, however, reverses the statutory

---

[14] An alternative way a person can commit the crime of aggravated trafficking in cocaine is if the State proves that the substance involved is "cocaine in a quantity of 112 grams or more." 17-A M.R.S. § 1105-A(1)(D) (2017). This alternative is not at issue here because the total weight of the material that contained some amount of cocaine is less than 112 grams.

construct because it is *cocaine*—not cocaine base—that can be "any mixture or preparation that contains any amount of" cocaine base. *See* 17-A M.R.S. § 1102(1)(F)(2)(c). As we held in *State v. Pinkham*, "when the Legislature uses the name of a drug and intends for the term to include mixtures containing that drug, it knows how to accomplish that result." 2016 ME 59, ¶ 21, 137 A.3d 203. With respect to its definitions of "cocaine" and "cocaine base," the Legislature has exhibited that skill. The Legislature established that a substance is "cocaine," no matter whether and what other ingredients may be present, so long as it contains any amount of any of the three forms of cocaine described in section 1102(1)(F)(2)(a)-(c). In contrast, the definition of "cocaine base" does not leave room for the presence of any extrinsic ingredients. If the Legislature had intended "cocaine in the form of cocaine base" to mean a mixture containing any amount of cocaine base, then, having gone so far as to define cocaine base as the alkaloid form of cocaine, *see* 17-A M.R.S. § 1102(1)(F)(2)(c), it could and would have done so either as part of that definitional provision or in section 1105-A(1)(D) itself.[15]

---

[15] In its Opinion, *see supra* ¶ 14, the Court points to the same passage I quote from *State v. Pinkham*, where we explained that the definition of "cocaine" found in section 1102(1)(F) is an example of the Legislature's ability to define a drug to allow for mixtures of that drug with other material. 2016 ME 59, ¶¶ 19-21, 137 A.3d 203; *see* 17-A M.R.S. § 1102(1)(F)(2)(a)-(c) (2017) (defining "cocaine" as "[a] mixture or preparation that contains any quantity of" cocaine, ecgonine, or cocaine base"). The statutory definition at issue here, however, is the separate term of "cocaine base," which—unlike the definition of "cocaine"—the Legislature has defined in specific terms that do not

25

[¶31]  Based on the Court's analysis, the cocaine that would suffice to meet the requirement of section 1105-A(1)(D) is not "cocaine in the form of cocaine base."  Rather, the substance could be anything at all, so long as it contains some amount—however miniscule—of cocaine base.  For that reason, the Court's conclusion that "cocaine base" means any concoction that contains any measure of cocaine base renders the phrase "in the form of cocaine base" as surplusage because the phrase is left with little effect.  *See State v. Tozier*, 2015 ME 57, ¶ 6, 115 A.3d 1240 ("Nothing in a statute may be treated as surplusage if a reasonable construction applying meaning and force is otherwise possible." (quotation marks omitted)).  In my view, pursuant to the definition in section 1102(1)(F)(2)(c), "cocaine base" *is* the alkaloid form of cocaine, and at trial that is what the State must prove the substance to be.

[¶32]  In contrast to the Court's analysis, when the statutory language at issue is read to require the requisite amount of actual cocaine base, all words in that phrase are given effect.  Although I agree that the Legislature could also have simply referred directly to "cocaine base" instead of "cocaine in the form

---

allow for a mixture with other substances.  *Id.* § 1102(1)(F)(2)(c).  Therefore, rather than supporting the Court's holding, our analysis in *Pinkham* demonstrates that, because the statutory references to "cocaine base" do *not* use the language that would tolerate a mixture, section 1102(1)(F)(2)(c) cannot properly be read to include cocaine base when it is merely one part of an amalgam.

of cocaine base," the word choice has meaning because it is a function of the structure of the overall definition of "cocaine" that begins with section 1102(1)(F). Starting there, the Legislature simply tracked its way through the definitional layers to end up at the particular subsection that contains "cocaine base." In this way, the Legislature particularized the substance at issue, so that the specific form of "cocaine" that must be quantified in a case such as this is— as the words make clear—cocaine in the form of cocaine base and not cocaine base as part of a mixture that in total weighs at least 32 grams. Further, as I discuss below, the legislative history shows that the Legislature used the phrases "cocaine base" and "cocaine in the form of cocaine base" interchangeably, revealing that the Legislature saw the phrases as having identical meanings.

[¶33] Therefore, in my view, pursuant to a plain language reading of sections 1102(1)(F) and 1105-A(1)(D), the State was obligated to prove that McLaughlin possessed at least 32 grams of cocaine base in isolation. No such evidence was presented at trial, and for that reason, McLaughlin cannot be convicted of aggravated trafficking on this record.

B.    Legislative History

[¶34]   Even if the relevant statutes were ambiguous, the legislative history supports the conclusion that the Legislature intended "cocaine in the form of cocaine base" to mean just that.   *See Stevens*, 2007 ME 5, ¶ 5, 912 A.2d 1229 (explaining that when statutory language is ambiguous, we look to legislative history for guidance).   This is apparent in two ways.

[¶35]  First, one of the legislative vehicles that resulted in the enactment of section 1105-A was Legislative Document 1457 from the 117th Legislature. The Office of the Attorney General presented an amendment to that bill to differentiate between "cocaine in the form of cocaine base (crack cocaine)" and "cocaine hydrochloride (powder cocaine)."   Comm. Amend. A. to L.D. 1457, No. H-696, Statement of Fact (117th Legis. 1995); Comm. Amend. A. to L.D. 1457, No. H-696 (117th Legis. 1995) (letter dated January 16, 1995 to Chairs of the J. Standing Comm. on Crim. Justice from David Lauren, an attorney with the Department of the Attorney General).   When referring to cocaine base, the Statement of Fact accompanying the Amendment uses the terms "cocaine in the form of cocaine base" and "cocaine base" interchangeably.[16]   L.D. 1457,

---

[16]  The following excerpt from the Amendment demonstrates the fungible use of the two terms:

> Section 3 of the amendment provides that a person is guilty of Aggravated Trafficking or Furnishing Scheduled Drugs if the person traffics in or furnishes

Comm. Amend. A. to L.D. 1457, No. H-696, Statement of Fact (117th Legis. 1995); *see Marcoux v. Parker Hannifin/Nichols Portland Div.*, 2005 ME 107, ¶¶ 11-12, 881 A.2d 1138 (indicating that a statement of fact accompanying a committee amendment to a proposed bill is a proper source of legislative history). Similarly, in testimony presented to the legislative committee of jurisdiction, Lauren, appearing for the Attorney General's office, explained that, pursuant to the Amendment, "[t]rafficking or furnishing 32 grams or more of *cocaine base* would constitute an [a]ggravating [f]actor under 17-A M.R.S. § 1105." *An Act to Deter the Spread of Crack Cocaine: Hearing on L.D. 1457 Before the J. Standing Comm. on Crim. Justice*, 117th Legis. (1995) (testimony of David Lauren) (emphasis added); *see Craig v. Caron*, 2014 ME 115, ¶ 14, 102 A.3d 1175 (relying in part on testimony presented to the legislative

---

*cocaine in the form of cocaine base* in a quantity of 32 grams or more. The 32-gram level is based upon: (1) evidence that individuals in possession of 32 grams or more of *cocaine base* have significant direct links to major sources of supply and present an extraordinary threat and risk to the health and safety of the citizens of the State of Maine; (2) evidence that 32 grams of *cocaine base* has a street value in excess of $12,000.00; (3) the comparison with 21 U.S.C. § 841(b)(1)(B)(iii) which establishes a five year minimum mandatory sentence for the distribution or possession with intent to distribute five or more grams of *cocaine base* . . . . Therefore, the Aggravated Trafficking or Furnishing level of 32 grams is consistent with the 4-gram cocaine base presumptive level for Trafficking in *Cocaine Base*.

Comm. Amend. A. to L.D. 1457, No. H-696, Statement of Fact (117th Legis. 1995) (emphases added).

committee of jurisdiction to evaluate legislative intent). Just as the Court places weight on the Amendment, I find it significant that, in his testimony before the Legislature, the representative of the very office that submitted the proposal assigned the same meaning to the term "cocaine base" and to the term contained in the Amendment, "cocaine in the form of cocaine base."

[¶36] Contrary to the Court's view, this demonstrates that there is no statutory difference between the two—"cocaine in the form of cocaine base" *is* "cocaine base"—and that the Legislature intended that section 1105-A(1)(D) require the State to prove the presence of at least 32 grams of cocaine base, exclusive of any other substance, in order for a defendant to be found guilty of aggravated trafficking of cocaine base.

[¶37] Second, as the Court notes, *see supra* ¶ 21, the legislative history establishes that the Legislature looked to 21 U.S.C.S. § 841(b)(1)(B)(iii) (LEXIS through Pub. L. No. 115-191), which is included in the federal Controlled Substances Act, as a guide for what became the weight threshold for cocaine base subsequently enacted in section 1105-A(1)(D). *See* Comm. Amend. A. to L.D. 1457, No. H-696, Statement of Fact (117th Legis. 1995). Section 841(a) criminalizes particular drug-related conduct, such as manufacturing and distributing controlled substances and possessing controlled substances with

the intent to manufacture or distribute—conduct that is similar to trafficking as defined in Maine law, *see* 17-A M.R.S. § 1101(17) (2017). Section 841(b)(1) then establishes the penalties for violations of section 841(a) based on the nature and weight of the drug. *See* 21 U.S.C. § 841(b)(1)(B) (LEXIS through Pub. L. No. 115-191). Section 841(b)(1)(B)(ii) sets out sentencing provisions for crimes involving the following forms of cocaine:

> **(ii)** 500 grams or more of a mixture or substance containing a detectable amount of--
>
> > **(I)** coca leaves . . . ;
> >
> > **(II)** cocaine . . . ;
> >
> > **(III)** ecgonine . . . ; or
> >
> > **(IV)** any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III).

Then, section 841(b)(1)(B)(iii) applies the same penalty provisions to crimes involving cocaine base by describing that form of the drug in the following way: "28 grams or more *of a mixture or substance described in clause (ii) which contains cocaine base.*" *Id.* § 841(b)(1)(B)(iii) (emphasis added).

[¶38] As the Court notes, *see supra* ¶ 14, we have recognized the Legislature's proven ability to define its terms clearly when it intends for a compound or mixture that includes some form of cocaine to be treated as

cocaine itself. *See Pinkham,* 2016 ME 59, ¶¶ 19-21, 137 A.3d 203. This additional legislative history bolsters that observation. Although the Legislature drew on the quantitative standard found in section 841(b)(1)(B)(iii) of the federal law, it notably did *not* adopt the connected federal language that explicitly states that cocaine base can mean a mixture of substances that merely includes cocaine base. The Legislature's choice to not use the very clear federal language it reviewed suggests that the Legislature purposefully did not intend to define the crime of aggravated trafficking of cocaine base in a way that would allow proof of less than 32 grams of that drug in isolation.

[¶39] In support of its holding, the Court also refers to another element of legislative history that I find to be unenlightening on the present issue. As the Court correctly notes, "the Legislature intended to impose harsher punishment on individuals in possession of smaller amounts of cocaine in the form of cocaine base because it saw the usable units of that drug as more harmful in smaller quantities than powdered cocaine." *See supra* ¶ 22. Because the Legislature deemed the weight of a single usage unit of cocaine base to be smaller than a single usage unit of cocaine hydrochloride, the Legislature reasonably concluded that a smaller batch of the former should be treated

comparably, for criminological purposes, to a larger batch of the latter. This says nothing, however, about the degree of *purity* that the Legislature intended to require for the State to prove the quantitative element for cocaine base as set out in section 1105-A(1)(D).

[¶40]   In fact, if anything, the Class A sentencing classification for a violation of section 1105-A(1)(D)—which enhances by twenty years in prison the maximum sentence that could be imposed for the straight Class B trafficking crime, *see* 17-A M.R.S. § 1103(1-A)(A) (2017)—suggests that great care must be exercised in defining the applicable scope of section 1105-A(1)(D). Pursuant to the holding reached by the Court, a person who traffics in 32 grams of a mixture or substance that contains only an insignificant amount of actual cocaine base would be just as guilty of the Class A offense as a person who possesses 32 grams—or more—of cocaine base in isolation. The Legislature has expressly allowed such a result for "cocaine" as defined in section 1102(1)(F)(2), because that reference to "cocaine" explicitly includes mixtures and preparations that contain any quantity of certain forms of cocaine. Without similar language assigned to the particularized definition of "cocaine base," the equivalence in criminal exposure for widely divergent levels of culpability does not lend confidence to the Court's conclusion that the Legislature intended

them to be treated on the same plane. *See Solomon*, 2015 ME 96, ¶ 9, 120 A.3d 661 (stating that statutes are to be construed so as to avoid unreasonable or illogical results); *see also Pinkham*, 2016 ME 59, ¶ 14, 137 A.3d 203 ("[W]hen interpreting a criminal statute, we are guided by two interrelated rules of statutory construction: the rule of lenity, and the rule of strict construction. Pursuant to each of these rules, any ambiguity left unresolved by a strict construction of the statute must be resolved in the defendant's favor." (quotation marks omitted)).

[¶41] For these reasons, I conclude that the legislative history resolves any ambiguities that may exist in the language of sections 1102(1)(F) and 1105-A(1)(D), and confirms that the Legislature intended that section 1105-A(1)(D) require the State to prove the presence of at least 32 grams of cocaine base itself for a person to be found guilty of aggravated trafficking of that drug.

C.    Conclusion

[¶42] The Legislature did not intend for the words, "cocaine in the form of cocaine base," to encompass adulterated cocaine base. In its case against McLaughlin, the State presented no evidence of the weight of actual cocaine base in which McLaughlin trafficked. Rather, the evidence regarding the

composition of the substance took two forms. The first was the Certificate of Controlled Substance Analysis, which indicated the presence of cocaine base mixed with other substances, but without any quantitative information about the weight of the cocaine base itself. Second, the State presented the testimony of its chemist, who was unable to state how much cocaine base was in the larger mixture. Because of the State's failure to present any evidence regarding the weight of the mixture, the court committed obvious error by allowing the jury to deliberate on the amount of cocaine base. *See Clewley v. Whitney*, 2002 ME 61, ¶ 8, 794 A.2d 87 (stating that for a party to be entitled to an instruction, the evidence must generate the issue that is the subject of the instruction); *see also State v. Fox*, 2014 ME 136, ¶ 22, 105 A.3d 1029 (discussing obvious error on an appellate challenge to jury instructions).

[¶43] For the same reason, and more importantly, the conviction for aggravated trafficking of cocaine base as defined in section 1105-A(1)(D) cannot stand because it is not supported by any evidence of the amount of cocaine base. *See State v. Johnson*, 2014 ME 83, ¶¶ 10-13, 95 A.3d 621 (vacating defendant's conviction because of insufficient evidence presented at trial).

[¶44]   Accordingly, I would vacate the conviction for that offense and remand for further proceedings on the lesser offense of trafficking in scheduled drugs.[17]  *See* 17-A M.R.S. § 1103(1-A)(A).

Jamesa J. Drake, Esq., and Rory A. McNamara, Esq. (orally), Drake Law, LLC, Auburn, for appellant Kashawn McLaughlin

Janet Mills, Attorney General, and Katie Sibley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2015-2040
FOR CLERK REFERENCE ONLY

---

[17]  If the lesser charge of trafficking in cocaine base proceeded to trial, the evidence of McLaughlin's possession of a substance containing cocaine base would not generate the statutory permissive inference of trafficking, *see supra* ¶ n.13, because that statutory inference arises only with proof of at least four grams of "cocaine in the form of cocaine base," *see* 17-A M.R.S. § 1103(3)(B).  For the reasons I have discussed in this dissenting opinion, this means cocaine base in isolation.  The absence of any quantitative evidence of cocaine base means that a jury cannot find the factual predicate for that permissive inference.  Nonetheless, the present record would allow the State to pursue a trafficking charge based on other types of evidence of drug dealing in the hotel room where McLaughlin and others were arrested.